UNITED STATES  DISTRICT COURT

Northern District of California

| | |
|---|---|
| CRAIGSLIST, INC., | No. C 08-05064 CW (MEJ) |
| Plaintiff, | **REPORT AND RECOMMENDATION RE:  CRAIGSLIST'S MOTION (1) FOR DEFAULT JUDGMENT AWARDING DAMAGES AGAINST DEFENDANTS AND (2) TO AMEND JUDGMENT TO ADD MESIAB LABS LLC AS JUDGMENT DEBTOR (DKT. #61)** |
| v. | |
| KEVIN MESIAB d/b/a ezadsuite.com; EASY AD, LLC, | |
| Defendants. | |
| _____/ | |

## I.  INTRODUCTION

Before the Court is Plaintiff craigslist, Inc.'s[1] ("Craigslist") Motion (1) for Default Judgment Awarding Damages Against Kevin Mesiab d/b/a ezadsuite.com, EasyAd, LLC (collectively "Defendants") and (2) To Amend Judgment to add Mesiab Labs, LLC ("Mesiab Labs") as a Judgment Debtor.  (Dkt. #61.)  The instant Motion represents an amended version of Craigslist's original Motion for Default Judgment, which was granted in part and denied in part pending third-party discovery by Craigslist to accurately determine damages caused by Defendants.  *Id.*  After thoroughly reviewing the parties' briefs, pleadings, and the controlling legal authorities, the undersigned RECOMMENDS that the District Court GRANT Craigslist's Motion as set forth below.

## II.  BACKGROUND

**A.     Factual Background**

Craigslist owns and operates the website www.craigslist.org, an Internet-based local classified ad service.  (First Amended Compl. ("FAC") ¶2, Dkt #18.)  Craigslist owns all right, title,

---

[1]Although Craigslist spells its name with a lower case letter "c," for ease of reading, when referring to Craigslist in this Order, the undersigned will use a capital "C."

and interest in its website, including its copyrights. (FAC ¶68.) Particularly, Craigslist has registered copyrights[2] in its website, including the post to classifieds, account registration, and account log-in features of the website. (*Id*. at ¶¶67-70.) Craigslist owns common law rights in the "craigslist" mark and is the owner of U.S. federal registration nos. 2395628, 2905107, 2985065, and 3008562 for the "craigslist" mark, covering "[a]dvertising and information distribution services," "online interactive bulletin boards for transmission of messages among computer users concerning classified listings," and "on-line computer data bases and on-line searchable databases featuring information, classified listings and announcements." (FAC ¶¶72, 73.)

Access to and use of the Craigslist website and services are governed by Craigslist's Terms of Use ("TOU"). (*Id*. at ¶¶10, 11, 33-37, Ex. A.) The TOU are posted on the website and website visitors cannot post ads or create accounts on the Craigslist website without first agreeing to the TOU. (*Id*. at ¶¶33-37.) According to Craigslist, "[t]he TOUs grant users a limited, revocable, nonexclusive license to access the craigslist website and use craigslist's services. The license limits the authorized uses of the website and services, and identifies types of uses that are not authorized." (FAC ¶34.) Particularly, the TOU prohibits such conduct as "posting ads on behalf of others," and using "any form of automated device or computer program that enables the submission of postings on craigslist without each posting being manually entered by the author thereof (an 'automated posting device'), including, without limitation, the use of any such automated posting device to submit postings in bulk or for automatic submission of postings at regular intervals." (*Id*. at ¶36, Ex. A, ¶¶ 7(y), 8.) The TOU also prohibits attempts "to gain unauthorized access to craigslist computer systems." (*Id*. at ¶36, Ex. A, ¶7(x).)

In addition to the TOU, Craigslist employs technological security measures to protect its website and services, including a verification program known as "the Complete Automated Public

---

[2]These registrations include: (1) TX0006866660, entitled "Accounts.craigslist.org 2004, registered September 19, 2008; (2) TX0006866648, entitled, "Accounts.craigslist.org 2008, registered on September 19, 2008; (3) TX0006866657, entitled, "Craigslist website 2006," registered on September 19, 2008; (4) TX0006866662, entitled, "Post.craigslist.org 2004; and (5) TX0006866661, entitled "Post.craigslist.org 2008," registered September 19, 2008. (FAC ¶70.)

UNITED STATES DISTRICT COURT
For the Northern District of California

Turing test to tell Computers and Human Apart" ("CAPTCHA") and telephone verification.  (*Id*. at ¶¶50-62.)  Craigslist utilizes CAPTCHAs to ensure that user accounts and user ads are created and posted manually (as is required by the TOU), and not via automated means.  (*Id*. at ¶¶54, 55.)  Craigslist also utilizes telephone verification in certain categories to prevent automated, repetitious, unauthorized, unlawful and abusive postings.  (*Id*. at ¶¶58-59.)  This lawsuit, in large part, concerns Defendants' development and sales of software, devices, and services aimed at circumventing these security measures.

Specifically, Craigslist alleges that Defendants, in operating the website and business www.ezadsuite.com, developed, advertised, and sold software programs to automate posting ads on Craigslist's website and utilized other automated devices and related services meant to circumvent Craigslist's security measures.  (*Id*. at ¶86.)  According to Defendants' advertisements, the "EasyAdSuite" software program, also known as "EasyAd Poster," allowed users to post "a hundred times more ads than you can by hand, with just a few easy clicks of your mouse."  (*Id*. at ¶¶86-87.)  Defendants advertisements also indicated that their program enabled users to "Post ***Unlimited Ads*** to Craigslist" and that their program was "***100% Automated*** - Set it up & walk away."  (*Id*. at ¶87.)  Craigslist alleges that Defendants also developed, advertised, and sold products and services that enable users to circumvent Craigslist's technological security measures to access portions of the copyright-protected craigslist website without Craigslist's authorization.  (*Id*. at ¶¶50-62, 86-104, 133-46.)  For instance, Defendants' offered a service to circumvent Craigslist's CAPTCHAs through instantaneous outsourcing for occasions when the EasyAd Suite program was unable to decode the CAPTCHA.  (*Id*. at ¶93.)  Defendants also offered CAPTCHA circumventions in bulk for prices ranging from $12.50 for 500 "Craigslist Captcha Credits," to $157.50 for 10,000 credits.  (*Id*. at ¶95; Weeks Decl. ¶3(b), Ex. 2, Dkt. #37.)  Additionally, Craigslist alleges that Defendants offered "Phone Verified Craigslist Accounts," which they marketed by touting: "Stay up to date with Craigslist's demanding verification procedures.  **We use Unique IPs & Phone Numbers**."  (FAC ¶¶90-91; Weeks Decl. ¶¶ 3(c), (d), Exs. 3, 4, Dkt. #37.)  According to Craigslist, Defendants offered their pre-verified Craigslist user accounts for prices ranging from $20 per account for five verified

**UNITED STATES DISTRICT COURT**
For the Northern District of California

3

1   accounts, to $6 per account for 1,000 verified accounts.  (FAC ¶92; Weeks Decl. ¶3(d), Ex. 4, Dkt.

2   #37.)

3         Craigslist alleges that, in the course of developing, updating, maintaining, and supporting

4   their auto-posting and circumvention systems, Defendants: (1) assented to Craigslist's TOU (FAC

5   ¶¶44-48, 100-01); (2) accessed and used Craigslist's website for purposes unauthorized by and in

6   violation of the TOU (*Id*. at ¶¶33-37, 81, 96-104); and (3) copied Craigslist's copyrighted website to

7   Defendants' computers, including creating unauthorized cached copies of the website (*Id*. at ¶¶96-

8   104).  Craigslist further charges that Defendants copied and used the "craigslist" mark without

9   authorization to advertise their software and services on the internet.  (*Id*. at ¶¶112-18, 171-79;

10  Weeks Decl. ¶3(e), Ex.5, Dkt. #37.)  Craigslist asserts that Defendants used the "craigslist" mark in

11  their advertisements deliberately to confuse consumers as to an affiliation, association, sponsorship,

12  or endorsement by Craigslist of Defendants' products and serviced, when, in fact, none existed.

13  (FAC ¶¶115-17.)

14        As a result of these activities, Craigslist alleges that Defendants illegally profited from sales

15  of the software and services.  (FAC ¶¶89, 90, 92, 93, 95, 110; Weeks Decl. ¶¶3(b) & Ex. 2, (e) & Ex.

16  5, (l) & Ex. 13, (t) & Ex. 25, ¶5 Exs. 19-22, Dkt. #37.)  Concurrently, Craigslist alleges that

17  Defendants' activities have caused it to suffer both monetary and intangible injuries.  (FAC ¶¶119-

18  27.)  Craigslist avers that it has suffered financial harm as a result of the increased demand for

19  resources caused by the many millions of unauthorized posts for which Defendants are responsible.

20  (FAC ¶¶119-27.)  Specifically, Craigslist states that the millions of unauthorized ads enabled by

21  Defendants require Craigslist to invest funds in additional equipment, increased bandwidth, and

22  increased personnel time to accommodate the unauthorized ad volume without delay and disruption

23  to Craigslist's services for legitimate users.  (FAC ¶¶119-27.)  Defendants' activities have also

24  forced Craigslist to incur substantial costs to investigate, remediate, prevent, and combat

25  Defendants' auto-posting software and services.  (FAC ¶120.)  Additionally, Craigslist asserts that it

26  has suffered and continues to suffer harm to its reputation and goodwill as a result of Defendants'

27  activities.  (*Id*. at ¶¶119, 123-24.)  Defendants' activities delay and disrupt the proper functioning of

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

the craigslist website and services, which, in turn, frustrates legitimate Craigslist users and causes users to blame Craigslist for the auto-posting and to abandon the service. (FAC ¶124; Weeks Decl. ¶3(z), Ex. 31, Dkt. #37.) Relatedly, Craigslist alleges that its goodwill may also be harmed when Defendants encourage and enable users to violate Craigslist's TOU, copyrights, contracts, and other legal rights, without notifying users that their activity is illegal. (FAC ¶¶104, 114-15.) Craigslist alleges that many legitimate consumers have blamed Craigslist for Defendants' interference with the fair and efficient operation of the craigslist website and some even suspect that Craigslist is profiting from the abusive auto-posting activity. (FAC ¶¶121, 123-24.)

Based on the foregoing allegations, Craigslist asserted claims against Defendants for: (1) Copyright Infringement, 17 U.S.C. § 101; (2) violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201; (3) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (4) violation of California Penal Code Section 502; (5) violation of the federal Lanham Act, 15 U.S.C. §§ 1114 and 1125(a); (6) Trademark Infringement under California Law; (7) breach of contract; (8) inducing breach of contract; (9) intentional interference with contractual relations; and (10) fraud. Pursuant to Rule 55 of the Federal Rules of Civil Procedure, the Court entered default judgment against Defendants on all claims presented by Craigslist. (Dkt. #55.) However, Craigslist's request for damages was deferred pending further discovery. *Id.*

Following its completion of the aforementioned discovery, Craigslist filed the instant motion requesting monetary damages and attorney's fees and costs. (Pl.'s Mot. 1:15-17, Dkt. #61.) Additionally, Craigslist claims that Defendants dissolved EasyAd and created a new entity, Mesiab Labs, after default judgment was entered against them. *Id.* at 1:18-20. Craigslist further claims that Mesiab Labs is successor to and an alter ego of Defendants and, as a result, Craigslist moves to add Mesiab Labs as a judgment debtor in this action. *Id.* at 1:20-22.

**B.   Procedural Background**

Craigslist initiated this lawsuit against Defendants on November 5, 2008. (Dkt. #1.) On February 10, 2009, Craigslist filed its First Amended Complaint and served it upon Defendants (Dkt. ##26, 27). After Defendants failed to file a timely response, Craigslist moved for entry of default

UNITED STATES DISTRICT COURT
For the Northern District of California

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1   (Dkt. #31), which the Clerk of Court entered on March 30, 2009 (Dkt. #33). Anticipating

2   Craigslist's forthcoming motion for default judgment, the Honorable Claudia Wilken, the presiding

3   judge in this matter, referred Craigslist's motion for default judgment to the undersigned on April 6,

4   2009 for preparation of a report and recommendation. (Dkt. #35.) On May 1, 2009, Craigslist filed

5   a Motion for Default Judgment. (Dkt. #36.) Based on the undersigned's report and

6   recommendation, Judge Wilken granted Craigslist's request for default judgment as to liability on

7   each of its claims. (Dkt. ##53, 55.) Judgment as to damages, however, was deferred, and the Court

8   provided Craigslist six months to conduct third-party discovery and requested that Plaintiff

9   thereafter re-file the default judgment motion with augmented evidence on the damages issues. *Id.*

10      After completing the required discovery, Craigslist submitted the instant Motion on May 4,

11  2010. (Dkt. #61.) In addition to ascertaining the amount of damages, Craigslist claims that

12  discovery revealed that Mesiab Labs is a proper party to its claim, and as a result, includes in this

13  Motion a request to amend judgment to add the company as a judgment debtor. (Dkt. #61.)

14  Defendants filed an Opposition on July 1, 2010 (Dkt. #72), and Craigslist filed a Reply on July 30,

15  2010 (Dkt. #78).

16                            **III. DISCUSSION**

17      In its Motion, Craigslist claims that Mesiab Labs is a proper judgment debtor in this action

18  and as a result, it claims that the judgment should be amended to include Mesiab Labs pursuant to

19  California Code of Civil Procedure § 187 ("Section 187"). (Pl.'s Motion, 16:17-27, Dkt. #61.)

20  Craigslist further claims that it is entitled to recover statutory, actual and punitive damages from

21  Defendants as well as attorney's fees and costs. *Id.* at 19:25-26.

22      In their Opposition, Defendants claim that Mesiab Labs is not a successor entity of

23  Defendants and is instead, they claim, "a distinct legal entity." (Defs.' Opp'n 4:18-19.) Defendants

24  also claim that although the type of damages sought by Craigslist is proper, the amount is

25  unjustified. *Id.* at 15:5-10.

26  ///

27  ///

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    **A.      Mesiab Labs as Judgment Debtor**

2              1.     Legal Standard

3              Federal Rule of Civil Procedure ("Rule") 69 provides that the law of the state in which the

4    federal court sits will apply in proceedings regarding money judgment.  Furthermore, the Ninth

5    Circuit has held that Section 187 bestows upon a court the authority to amend a judgment to add

6    additional judgment debtors.  *In re Levander*, 180 F.3d 1114, 1121 (9th Cir. 1999).   To amend a

7    judgment under Section 187, two requirements must be met.  First, the new party must be the alter

8    ego or successor corporation of the old party, and second, the new party must have "controlled the

9    litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns."

10   *Id.*; *McClellan v. Northridge Park Townhome Owners Assoc., Inc.*, 89 Cal. App. 4th 746, 753

11   (2001); *Triplett v. Farmers Ins. Exchange*, 24 Cal. App.4th 1415, 1421 (1994).

12             To find that the new party is the alter ego of the old requires application of a two-part test.

13   "First, there must be such a unity of interest and ownership between the corporation and its equitable

14   owner that the separate personalities of the corporation and the shareholder do not in reality exist."

15   *Sonora Diamond Corp. v. Superior Court*,  83 Cal. App. 4th 523, 538 (Cal. App. 5. Dist. 2000).

16   "Second, there must be an inequitable result if the acts in question are treated as those of the

17   corporation alone."  *Id.*

18             Although generally a corporation that has acquired the assets of another will not be liable for

19   the debts and liabilities of the former, a corporation will be held liable as a successor where: "(1) the

20   purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a

21   consolidation or merger of the two corporations, (3) the purchasing corporation is merely a

22   continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape

23   liability for debts."  *McClellan*, 89 Cal. App. 4th at 753.  When the old corporation "organizes

24   another corporation with practically the same shareholders and directors, transfers all the assets but

25   does not pay all the first corporation's debts, and continues to carry on the same business," it will be

26   considered the successor of the former and "the new corporation held liable for the obligations of the

27   old."  *Id.*  Finally, if the new entity consists of the same people as the old and those people are

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    present during and participate in the litigation, then the new entity is considered in control of the

2    litigation. *Levander*, 180 F.3d at 1123.

3            2.      <u>Application to the Case at Bar</u>

4            Craigslist argues that Mesiab Labs is the alter ego of Defendant EasyAd and that Mesiab

5    Labs controlled the litigation and therefore had the opportunity to litigate.  (Pl.'s Mot. 16:16-17,

6    17:1, 19:10-11, Dkt. #61.)  Because Craigslist claims that both prongs of Section 187 are met, it

7    contends that amending the judgment to add Mesiab Labs is proper.  *Id.* at 19:22-24.

8            In response, Defendants claim that Mesiab Labs is not a successor entity of EasyAd.  (Defs.'

9    Opp'n 12:3, Dkt. #72.)  Defendants argue that Mesiab Labs does not meet the requirements of either

10   prong of the test laid out in Section 187 because the "business undertakings of the two entities were

11   and are entirely separate, distinct and unique."  *Id.* at 15:1-3.  Defendants claim that because Mesiab

12   Labs fails the Section 187 test, amending the judgment to include it as a judgment debtor is

13   improper.  *Id.* at 14:17-19.

14           *a.      Mesiab Labs as Alter Ego or Successor Entity to EasyAd*

15           In order to fulfill the first prong of the Section 187 test, the Court must find that Mesiab Labs

16   is either the alter ego or successor entity to EasyAd.  *Levander*, 180 F.3d at 1121.  The alter ego test

17   requires both a unity of interest and an inequitable result if the two entities are treated as separate.

18   *Sonora Diamond Corp.,* 83 Cal. App. 4th at 538.

19                   *i.      Unity of Interest*

20           Craigslist claims that there is a unity of interest between EasyAd and Mesiab Labs.  (Pl.'s

21   Mot. 17:12-13, Dkt. #61.)  Specifically, Craigslist argues that Defendants failed to respect corporate

22   formalities, used funds as if they were interchangeable with personal assets, and that EasyAd and

23   Mesiab Labs were both controlled and operated by the same three individuals.  *Id.* at 17:21-25.

24   Craigslist claims these facts establish the unity of interest between the two entities.  *Id.* 17:12-13.

25           Defendants argue that Mesiab Labs did not receive any funds from EasyAd, that Mesiab

26   Labs created and sold "a completely new product that is unarguably unique and separate from the

27   product sold by EasyAd," and that Mesiab Labs was controlled entirely by Tyson Quick.  (Defs.'

28

8

1    Opp'n 13:4-12, Dkt. #72.)  Based on these claims, Defendants argue that no unity of interest exists.

2    *Id.* at 13:15-17.

3        In determining whether the requisite unity of interest and ownership exists, courts look to

4    a variety of factors, including but not limited to: the unauthorized diversion of corporate funds or

5    assets to other than corporate uses; treatment by an individual of the assets of the corporation as

6    his own; failure to segregate funds of the separate entities; commingling of funds and other assets;

7    the identical equitable ownership in the two entities; the identification of the equitable owners

8    thereof with the domination and control of the two entities; the use of the same office or business

9    location; the employment of the same employees; disregard of legal formalities, and failure to

10   maintain minutes or adequate corporate records.  *Associated Vendors, Inc. v. Oakland Meat Co.,*

11   210 Cal. App. 2d 825, 838 (1962).

12       Although Defendants deny that EasyAd assets were used to create Mesiab Labs, fees for both

13   the "Certificate of Organization" and the "assumed business name" were paid for by checks from an

14   EasyAd account.  (Weeks Decl. ¶ 21, Ex. 10, 52:20-54:24; Ex. 11, p. 62, Dkt. ## 57, 58-10, 58-11.[3])

15   Furthermore, on December 19, 2008, EasyAd was dissolved and on the same day, Mesiab Labs was

16   created.  (Quick Depo. 132:5-133:15, Exs. 1, 5.)  As part of the dissolution of EasyAd, all of the

17   company's remaining funds were withdrawn and distributed amongst Mesiab, Quick and Boone,

18   who also serve as Mesiab Labs' principle employees.  *Id.* at 215:5-218:8.  Additionally, the address

19   filed with the State of Idaho for both EasyAd and Mesiab Labs was the residence of Mesiab.  *Id.* at

20   12:16-14:2, Ex. 1.  Finally, based on the testimony of both Quick and Mesiab, there appears to have

21   been little or no attempt made to respect corporate formalities beyond the initial incorporation of

22   both entities, and corporate funds were often used interchangeably as personal expenses.  (*Id.* at

23

24

─────────────────

25       [3]Dkt. #57 is the Weeks Declaration, which refers to exhibits included in Dkts. #57-59.  Dkt.

26   #58-10 and Dkt. #58-11 are comprised of Parts 1 and 2 of the Tyson Quick Deposition, including the
     exhibits attached to that Deposition.  From this point forward, the Court will refer to these

27   documents as "Quick Depo."  Page and exhibit numbers included in citations to the "Quick Depo."

28   represent the page numbers and exhibits included therein.

UNITED STATES DISTRICT COURT
For the Northern District of California

157:21-158:16; Weeks Decl. ¶ 20, Ex. 9, 43:11-46:25, Dkt. ## 57, 58-8, 58-9.[4])  These facts, offered

by Defendants' own admissions, address nearly all of the elements laid out in *Associated Vendors*.

Therefore, the Court finds that a unity of interest between Mesiab Labs and EasyAd clearly exists in

this case.

### ii.     Inequitable Result

Craigslist claims Mesiab Labs was created in an effort to avoid liability in the instant action

and that if Mesiab Labs is not considered an alter ego of EasyAd, an inequitable result will follow.

(Pl.'s Mot. 17:25-28, Dkt. # 61.)  Craigslist further states that, because Mesiab is now claiming that

he has a negative net worth, if Mesiab Labs is not included as a judgment debtor it will be

impossible to recover damages and Defendants will have successfully "thwarted the legal process."

*Id.* at 17:26-18:14.

Defendants argue that adding Mesiab Labs as a judgment debtor would only be appropriate if

EasyAd was dissolved and Mesiab Labs created for the sole purpose of carrying on the same or

similar business practices.  (Defs.' Opp'n 14:5-9, Dkt. #72.)  Defendants contend that because

Mesiab Labs offers products that are "wholly separate" from EasyAd they have in "no way assisted

Defendants from avoiding an award arising from this litigation, or concealed EasyAd funds."  *Id.* at

14:9-13.

In order to determine that an inequitable result will occur, there must be more than simply an

unsatisfied creditor who is unable to collect the judgment they seek and instead "some conduct

amounting to bad faith mak[ing] it inequitable" to treat the corporate entity as separate.  *Associated*

*Vendors, Inc.,* 210 Cal. App. 2d at 842.  In the instant case, Mesiab sent an e-mail to Jody

Graffunder, a defendant in a separate action brought by Craigslist, that stated:

> I'm not sure if [Craigslist] know[s] this or not but I can stop this entire proceeding in its
> tracks at any moment.

---

[4]As previously stated, Dkt. #57 is the Weeks Declaration which refers to exhibits included in
Dkts. #57-59. Dkt. #58-8 and Dkt. #58-9 are comprised of Parts 1 and 2 of the Kevin Mesiab
Deposition, including the exhibits attached to that Deposition.  From this point forward, the Court
will refer to these documents as "Mesiab Depo."  Page and exhibit numbers included in citations to
the "Mesiab Depo." represent the page numbers and exhibits included therein.

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Step 1.) File w/ the California St. Supreme court [sic] and request a default judgement [sic] be filed against me.

Step 2.) I re-prepare my IRS tax forms and write off the judgement [sic] as a loss and eliminate my tax burden completely.

Step 3.) Transfer all tangible assets (vehicles, etc) to family members.

Step 4.) File bankruptcy

Step 5.) (Already completed) Establish a new LLC under a third party name (Mesiab Labs LLC, Chaired by my trusted associate, Tyson Quick, of which I am a silent partner). Mesiab Labs is the company w/ the deal w/ Backpage and is untouchable by present litigation.

(Weeks Decl. ¶ 14, Ex. 8 p.6-7, Dkt. #57-8.)  The e-mail represents a clear admission by Mesiab that

Mesiab Labs was created as an entity that would remain "untouchable by present litigation."

Defendants do not attempt to address or explain the statements of Mesiab, nor do the arguments they

present negate the blatant bad faith demonstrated in the e-mail.  Therefore, the undersigned finds

that the statements of Mesiab in the referenced e-mail are sufficient to establish that because

Defendants' actions amount to bad faith in this instance, an inequitable result would occur should

Mesiab Labs be treated as a separate entity and not attached as a judgment debtor.

> b.    *Mesiab Labs as Successor Entity to EasyAd*

The successor entity test imposes liability where all of the following requirements are met:

(1) express or implied agreement by the purchaser to assume liability; (2) a transaction that amounts

to a consolidation or merger of the two entities; (3) mere continuation of the selling corporation by

purchasing corporation; or (4) a fraudulent transaction entered into in an attempt to escape liability

from debts.  *McClellan*, 89. Cal. App. 4th at 753.

Craigslist claims that Mesiab Labs meets the third and fourth requirements of the *McClellan*

test and should therefore be considered a successor entity to EasyAd.  (Pl.'s Mot. 18:21-22, Dkt.

#61.)  Specifically, Craigslist argues that Mesiab labs was created to continue the work previously

performed by EasyAd and furthermore as part of a scheme to allow Defendants to escape liability in

this action.  *Id.* at 18:23-24,19:7-8.

Defendants argue that Mesiab Labs received no material assets from EasyAd and that

Craigslist's allegations that Mesiab Labs was created to continue the work of EasyAd is "contrary to

the plain facts."  (Defs.' Opp'n 14:22-15:1, Dkt. #72.)  Defendants further claim that although the

same individuals were involved in Mesiab Labs and EasyAd, the business undertakings of the two

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1   entities are "entirely separate, distinct and unique" and that Mesiab Labs was, in fact, created to

2   terminate the work of EasyAd, not continue it.  *Id.* at 15:1-3.

3                       i.      *Mesiab Labs As a Mere Continuation of EasyAd*

4          A "[p]laintiff must plead facts alleging that only one corporation remained after the transfer

5   of assets and that there is an identity of stock, stockholders, and directors between the two

6   corporations in order to assert successor liability under the mere continuation exception." *Ferguson*

7   *v. Arcata Redwood Co., LLC*, No. C 03-05632 SI, 2004 WL 2600471, at *5 (N.D. Cal. November

8   12, 2004) (internal quotations omitted).  Therefore, whether Mesiab Labs carries on precisely the

9   same business undertaking is not determinative, as Defendants argue.  Rather, because neither entity

10  was publicly traded and there is no stock involved, the undersigned must rely on whether only one

11  corporation remained after the transfer of assets and the identities of the directors in drawing a

12  conclusion.

13         In the previous section, the undersigned concluded that Mesiab Labs was created using

14  EasyAd funds.  (*See* Sec. III(A)(2)(a)(i).)  Furthermore, as previously stated, EasyAd was dissolved

15  on the same day as Mesiab Labs was created, which left only one corporation remaining. (Quick

16  Depo. 132:5-133:15, Exs. 1, 5.)  Moreover, Defendants admit that the same three individuals were

17  instrumental in both entities, and the record supports the contention that Mesiab, Quick and Boone

18  were in fact the only officers of both EasyAd and Mesiab Labs, and that the three held the same

19  titles in both corporations.  (Defs.' Opp'n 15:1-3, Dkt. #72; Quick Depo. 124:6-126:12, Ex. 4;

20  Mesiab Depo. 107:21-108:11.)  Based on these facts, the undersigned finds that because only

21  EasyAd remained after the transfer of assets and the two corporations shared the same directors,

22  Mesiab Labs can properly be considered a mere continuation of EasyAd under *McClellan* and

23  *Ferguson*.

24                      ii.      *Fraudulent Transaction*

25         In order to establish that a transaction is fraudulent, courts may inquire whether the intent of

26  the purchaser or seller was to create the new entity solely to circumvent liability.  *Atchison, Topeka*

27  *and Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 365 (9th Cir. 2007).  Because, as

28

1   previously discussed, the e-mail correspondence from Mesiab to Graffunder establishes that Mesiab

2   Labs was created for the sole purpose of circumventing liability in this action, the undersigned finds

3   that this requirement is met.  (*See* Sec. III(A)(2)(a)(ii).)

4          In the instant action, both the third and fourth prong of the *McClellan* test are met; therefore,

5   Mesiab labs may properly be considered a successor entity to EasyAd.  Furthermore, because either

6   the *Sonora Diamond* or *McClellan* test can be imposed to satisfy the first prong of Section 187, and

7   both are met in this case, the undersigned finds that Mesiab Labs clearly meets the first requirement

8   to be added as a judgment debtor in this action.

9                    *c.      Mesiab Labs Controlling the Litigation*

10         Craigslist argues that it can be presumed that because Mesiab Labs is the alter ego of

11  EasyAd, Mesiab Labs was aware of and had equal opportunity to control the litigation as did

12  Defendants.  (Pl.'s Mot. 19:11-14, Dkt. #61.)  Craigslist further argues that because Mesiab

13  personally controlled the litigation up to this point and also appeared as Mesiab Labs' Rule 30(b)(6)

14  witness, Mesiab Labs had ample opportunity to control the litigation.

15         Defendants offer no counter argument in regards to whether Mesiab Labs had control of the

16  litigation sufficient to fulfill the second prong of Section 187.

17         When one corporation is determined to be the successor entity of another, that corporation

18  may not claim that it lacked the opportunity to control the litigation brought against the original

19  entity.  *McClellan*, 89 Cal. App. 4th at 757.  Thus, because the undersigned has determined that

20  Mesiab Labs is the successor entity to EasyAd, Mesiab Labs is barred from claiming that it was not

21  afforded the opportunity to control the litigation.  Therefore, the undersigned finds that Mesiab Labs

22  had ample opportunity to control the litigation and the second prong of Section 187 is satisfied.

23         Because Mesiab Labs is the alter ego or successor entity of EasyAd and, as such, was

24  afforded the opportunity to control the litigation, the undersigned finds it proper to add it as a

25  judgment debtor in the instant action under Section 187.  Therefore, the undersigned

26  RECOMMENDS that the Court GRANT Craigslist's request to add Mesiab Labs as a judgment

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

13

1   debtor in this action.[5]

2   **B.      Damages**

3          Craigslist seeks statutory, actual and punitive damages in the total amount of $9,650,700 and

4   attorneys' fees and costs totaling $406,525.46.  (Pl.'s Mot. 26:9-11, Dkt. #61.)  Craigslist's

5   calculation of damages is based upon Defendants' violation of the Digital Millennium Copyright Act

6   ("DMCA"), the provisions of the Lanham Act, and Craigslist's claims that Defendants acted with

7   "knowing, deliberate, intentional, willful and conscious disregard" of its rights and the law.  *Id.* at

8   19:26-20:3.

9          Although Defendants stipulate to the $119,744.48 of total actual damages that Craigslist

10  requests, they claim the amount for statutory damages is inconsistent with previous rulings under the

11  DMCA.  (Defs.' Opp'n 9:1-5, 10:7-12, Dkt. #72.)  Defendants additionally argue that punitive

12  damages are inappropriate in this case.  *Id.* at 11:5-15.  Defendants claim Craigslist is entitled to a

13  total of $1,312,944.48 in damages.  *Id.* at 15:5-9.  Furthermore, Defendants claim that Craigslist

14  should be entitled to no more than $75,000 for attorneys' fees and costs.  *Id.* at 15:9-10.

15          1.     Statutory Damages Under the DMCA

16                 a.      *Legal Standard*

17          In the initial report and recommendation, the undersigned found that Craigslist stated claims

18  for violations of sections 1201(a)(2) and (b)(1) of the DMCA.  (*Report and Recommendation Re*

19  *Craigslist's Motion for Default Judgment*, 17:12-18, Dkt. #53.)  Judge Wilken adopted the

20  undersigned's report and recommendation in every respect.  (Dkt. #55.)  A party who violates

21  section 1201 is liable for either actual damages or statutory damages, based on the injured party's

22  election.  17 U.S.C. § 1203(c)(1).  The DMCA further provides that a party who elects to recover a

23  statutory damage award is entitled to recover not less than $200 and not more than $2500 for each

24  violation of section 1201 "per act of circumvention, device, product, component, offer, or

25  performance of service, as the court considers just."  17 U.S.C. § 1203(c)(3)(A).  The court has total

26

27

28          [5]Hereinafter, the term "Defendants" will refer to all Defendants, including Mesiab Labs.

14

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   discretion in determining the amount of statutory damages to be awarded, within the statutory limit.

2   *Peer International Group v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990).[6]

3           b.      *Application to the Case at Bar*

4                   i.      *Sales of Easy Ad Poster Deluxe*

5           Craigslist argues that because the EasyAd software was specifically designed to circumvent

6   Craigslist's CAPTCHA, an award "at the upper end of the range is warranted." (Pl.'s Mot. 20:21-

7   25, Dkt. #61.) Craigslist further argues that Defendants sold the EasyAd Poster Deluxe software to

8   Troopal, an entity that offered similar circumvention products, after default judgment was entered

9   against them in this action, thus profiting after this suit was filed. *Id.* at 22:11-13. Based on these

10  contentions, Craigslist is seeking to recover the statutory maximum for each device sold. *Id.* at

11  22:18-19. Craigslist claims that because there were 2,983 devices sold and the maximum penalty for

12  each is $2,500, damages for the sales of EasyAd Poster Deluxe should total $7,457,500. *Id.* at

13  18:21-22.

14          Defendants argue that the statutory maximum is inappropriate because they abandoned the

15  business within a month of the initiation of this litigation. (Defs.' Opp'n 7:13-16, Dkt. #72.)

16  Defendants further argue that there was no actual sale to Troopal. *Id.* at 7:17-22. Accordingly,

17  Defendants contend that $400 per violation is proper and that $1,193,200 is the total amount of

18  damages Craigslist is entitled to for the sale of EasyAd Poster Deluxe. *Id.* at 9:1-5.

19          In *Filipiak*, this Court held that a statutory damage award of $800 per violation of the DMCA

20  was appropriate where the violator had knowledge of his violations and destroyed records so that the

21  court was unable to determine the actual amount of devices sold. *Filipiak*, 406 F. Supp. 2d at 1075.

22  Further, the Court found that where the violator signed an agreement promising not to sell any

23  additional circumvention devices yet sold 155 of them after the agreement was signed an award of

24

25          [6]In *Peer International*, the court awarded damages for violation of Copyright Act, 17 U.S.C.

26  §§ 101 *et seq. Id.* This Court has previously held that it is proper to look at cases under the
    Copyright Act in determining whether an award of statutory damages under the DMCA is just. *Sony*

27  *Computer Entertainment America, Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1074 (N.D. Cal. 2005).

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1   $2,500 per violation was warranted for each of those 155 devices. *Id.*  Similarly, this Court found

2   that $800 per violation was an appropriate award where a DMCA violation was committed with

3   knowledge that the conduct constituted copyright infringement and could therefore be considered

4   "willful." *Sony Computer Entertainment America, Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 968

5   (N.D. Cal. 2006) (citing *Dolman v. Agee*, 157 F.3d 708, 715 (9th Cir. 1998)).

6          Defendants have admitted that they intentionally designed around Craigslist's CAPTCHA

7   system, which establishes that they had knowledge of the violations and, knowing that their actions

8   constituted copyright infringement, committed them willfully.  (Weeks Decl. ¶ 14, Ex. 8 p.1, Dkt.

9   #57-8.)  Furthermore, although there has been no destruction of records, the attempt to shield assets

10  from liability through the creation of a new corporate entity, as previously discussed,[7] rises to or

11  exceeds the level of fraudulence demonstrated in *Filipak*.  Because Defendants acted at least as

12  egregiously as the violators in *Filipak* and *Sony*, Craigslist is entitled to damages of no less than

13  $800 per device sold.

14         Moreover, although Defendants contend that they did not "distribute or support, directly or

15  indirectly, any sale of the offending software after dissolving EasyAd" in December 2008 pursuant

16  to the injunction issued by the Court in this action (Dkt. #56), their own admissions contradict this

17  claim.  (Defs.' Opp'n 7:13-15, Dkt. #72.)  Mesiab admits that after shutting down EasyAd, Troopal

18  agreed to pay Defendants $10,000 for the software and that Defendants received a partial payment of

19  the total amount from Troopal.  (Mesiab Depo. 153:16-154:3.)  Additionally, Mesiab states that

20  Defendants directed their customers to Troopal to find the software.  *Id.*  Therefore, although

21  Defendants did not continue to sell the devices, they did receive income from Troopal's continued

22  sale and supported those sales by directing customers to Troopal.  Furthermore, whereas the

23  violators in *Filipak* went against a signed agreement, Defendants actions were in violation of a

24  court-ordered injunction.

25         Whereas in *Filipak*, the court was able to apply a separate per violation penalty for devices

26

27         [7]For a full discussion of Defendants' intent to create Mesiab Labs as a means to escape

28  liability in this action see Sec. III(A)(2)(a)(ii) and Sec. III(A)(2)(b)(ii).

16

1    sold before and after the breach of agreement between the parties, in this case, Defendants did not

2    directly sell more devices after they failed to comply with the injunction and instead profited from

3    and supported the sale by Troopal, making it impossible to impose the same per violation increase.

4    However, because the undersigned finds Defendants' actions so clearly demonstrated their disregard

5    for the injunction issued by this Court, the per violation penalty for all devices sold shall be

6    increased to reflect Defendants' participation in the continued sale and success of the EasyAd Poster

7    Deluxe software by Troopal.  Accordingly, the undersigned finds that an award of $1,500 per device

8    is appropriate for each sale of the EasyAd Poster Deluxe software.  Because there were 2,983

9    devices sold, the undersigned finds the appropriate total for damages for the sale of EasyAd Poster

10   Deluxe devices is $4,474,500.

11                             *ii.      Sale or Offer of CAPTCHA Credits*

12          Craigslist is seeking separate and additional damages based on the number of CAPTCHA

13   credits sold or offered on Defendants' site.  (Pl.'s Mot. 22:24-25, Dkt. #61.)  Craigslist claims that

14   they are entitled to $400 per offer made by Defendants.  *Id.* at 23:13-17.  Although Craigslist further

15   claims that there were likely millions of offers, they seek to recover damages only for the 2,983

16   offers they claim Defendants made with each sale of the EasyAd Poster Deluxe software.  *Id.*  The

17   total damages Craigslist seeks for Defendants sale or offer of CAPTCHA credits is $1,193,200.  *Id.*

18          Defendants argue that the damages sought by Craigslist for the sale or offer of CAPTCHA

19   credits is unjustified.  (Defs.' Opp'n 9:5-8, Dkt. #72.)  Defendants further argue that although

20   EasyAd assisted a third-party in offering CAPTCHA credits, Defendants did not receive revenue or

21   royalties from any sale of those credits.  *Id.* at 9:7-12.  Defendants maintain that a maximum of one

22   violation of the DMCA should be assessed for their part in the sale or offer of CAPTCHA credits.

23   *Id.* at 9:12-13.

24          This Court, in *Craigslist v. Paul Hubert*, has previously found it reasonable to calculate

25   damages for CAPTCHA credits by inferring that an offer to sell was made to every user of a

26   website.  *Craigslist v. Paul Hubert*, No. C 08-05067 JW, Dkt. #63 (N.D. Cal. April 15, 2010).  In

27   this case, those customers who purchased the EasyAd Poster Deluxe software may properly be

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   considered "users" for the purpose of assessing damages.  Furthermore, because damages under the

2   DMCA may properly be calculated based on offers to sell and not actual sales, Defendants argument

3   that damages for the sale or offer of CAPTCHA credits are improper because they were sold through

4   a third party is without merit.  17 U.S.C. § 1203(c)(3)(A).  Therefore, because it is uncontested that

5   Defendants' site offered to sell CAPTCHA credits designed to circumvent Craigslist's security

6   design and those offers were made to at least the number of people who purchased the EasyAd

7   Poster Deluxe software, the undersigned finds that Defendants are liable for damages for 2,983

8   offers.

9        Craigslist argues that the proper per violation penalty for Defendants' offers to sell

10   CAPTCHA credits is $400.  (Pl.'s Mot. 23:13-17, Dkt. #61.)  In *Hubert*, the Court found that $400

11   per violation was reasonable considering the less egregious and malicious nature of the offers.

12   *Craigslist v. Paul Hubert*, NO. C 08-05067 JW, Dkt. #63.  Based on the nature of the offers and the

13   previous holding of this court, the undersigned finds that a penalty of $400 per violation is

14   appropriate for Defendants offers to sell CAPTCHA credits.

15        The undersigned finds that Craigslist is entitled to statutory damages under the DMCA for

16   Defendants' offers to sell CAPTCHA credits in the amount of $400 per violation and further finds

17   that Defendants committed 2,983 violations, bringing the total amount of damages here to

18   $1,193,200.

19               *iii.*      *Offer of Craigslist Telephone-Verified Accounts*

20        Craigslist additionally seeks DMCA damages for each offer of a Craigslist telephone-verified

21   account made by Defendant.  (Pl.'s Mot. 22:23-26, Dkt. #61.)  The "Adult" and "Therapeutic

22   Services" categories on Craigslist's website require telephone-verification in order to post

23   advertisements and the telephone-verified accounts offered by Defendants allowed purchasers to pay

24   to have their accounts fraudulently verified by contracted employees or devices.  *Id.* at 24:2-4.

25   Craigslist claims that Defendants made at least 1,000 of these offers and seeks a per-violation

26   penalty of $1,000 for each offer, bringing the total amount sought for offers of telephone-verified

27   accounts to $1,000,000.  *Id.* at 24:6-8.  Craigslist argues that the higher penalty is necessary to deter

28

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1   other telephone-verified account sellers.  *Id.*

2       Defendants claim that the damages Craigslist seeks for their offers of telephone-verified

3   accounts are unjustified.  (Defs.' Opp'n 9:6-7, Dkt. #72.)  Like the CAPTCHA credits, Defendants

4   claim that the telephone-verified accounts were sold through a third-party and that they received no

5   monetary gain from the sales.  *Id.* at 9:8-14.

6       As discussed in the previous section, the DMCA does not require an actual sale in order to

7   award damages, and because Defendants do not contest that there were offers for telephone-verified

8   accounts made on their website, they are liable for damages for each offer.  Furthermore, the record

9   supports Craigslist's claim that at least 1,000 offers for telephone-verified accounts were made on

10  Defendants' site.  (Mesiab Depo. 39:11-41:11, Ex. 2.)  This Court has previously awarded damages

11  under the DMCA in the amount of $200 per violation for the offer or sale of telephone-verified

12  accounts.  See *Craigslist v. Realworks Group, LLC*, No. C 08-05072 JW, Dkt. #44 (N.D. Cal.

13  October 29, 2009).  Craigslist urges the court to raise the per violation penalty to deter future

14  telephone-verified account sellers; however, considering the total damages awarded in this action,

15  the undersigned finds that $1,000 per violation is excessive and instead finds that $400 is a

16  reasonable per-violation penalty.

17      Based on the $400 per-violation penalty and Defendants 1,000 offers, the undersigned finds

18  that Craigslist is entitled to a total of $400,000 in damages under the DMCA for their offers of

19  telephone-verified accounts.

20      In sum, the undersigned finds that Craigslist is entitled to statutory damages under the

21  DMCA in the amount of $4,474,500 for the sale of EasyAd Poster Deluxe software, $1,193,200 for

22  the offer of CAPTCHA credits and $400,000 for the offer of telephone-verified accounts.  In total,

23  the undersigned finds that a statutory damages award of $6,067,700 is proper under the DMCA.

24      2.   Actual Damages

25      Although Craigslist cannot recover both statutory and actual damages for Defendants'

26  DMCA violations, it is entitled to actual damages pursuant to the Lanham Act for Defendants'

27  trademark infringement.  15 U.S.C. § 1117.  Accordingly, Craigslist seeks actual damages in the

28

19

1   amount of Defendants' Google Adword advertising expenses to compensate for the unauthorized use

2   of the Craigslist mark.  (Pl.'s Mot. 24:13-15, Dkt. #61.)  Craigslist claims that Defendants used its

3   mark in an effort to confuse users into believing that their product had an actual affiliation with or

4   approval from Craigslist.  *Id.* at 24:25-28.  Craigslist seeks a total of $119,744.48 of actual damages,

5   an amount equal to Defendants' advertising expenses.  *Id.* at 24:28-25:2.

6        In their Opposition, Defendants stipulate to the amount of actual damages sought by

7   Craigslist.  (Defs.' Opp'n 10:9-12, Dkt. #72.)

8        The Ninth Circuit in *U-Haul International, Inc. v. Jartran, Inc.* created a presumption that,

9   when attempting to measure actual damages under the Lanham Act, a plaintiff's damages equal the

10   amount of money spent by defendants on advertising.  See *U-Haul International, Inc. v. Jartran,*

11   *Inc.*, 793 F.2d 1034 (9th Cir. 1986).  Based on *U-Haul*, Craigslist's determination of actual damages

12   is appropriate.  Furthermore, because Defendants have stipulated to the amount Craigslist seeks to

13   recover, the undersigned need not dedicate any further analysis to this issue.  Therefore, the

14   undersigned finds that Craigslist is entitled to $119,744.48 in actual damages for Defendants'

15   violation of the Lanham Act.

16        3.    Punitive Damages

17        Craigslist claims that it is entitled to punitive damages based on Defendants' "knowing,

18   deliberate, willful and conscious disregard of [its] rights or [Defendants'] flagrant and arrogant

19   disregard for the rule of the law."  (Pl.'s Mot. 25:3-6, Dkt. #61.)  Craigslist highlights several key

20   facts that, it argues, support an award of punitive damages, including: Defendant Mesiab's position

21   as a "leader in the online auto-posting community"; Defendants alleged continued efforts to run their

22   auto-posting business and support of other auto-posting businesses after representing to Craigslist

23   that they had stopped; and Defendant Mesiab's "decision to flout the Court's authority in this

24   matter."  *Id.* at 25:9-18.  Craigslist further argues that punitive damages will send a strong message

25   to Defendants that their behavior is intolerable and to the "entire online black hat community" that

26   the type of misuse of Craigslist's website demonstrated by Defendants is unacceptable.  *Id.* at 25:19-

27   22.

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Defendants argue that an award of punitive damages is not supported by the facts of this

2   case. (Defs.' Opp'n 11:5-7, Dkt. #72.)  Defendants further argue that the statutory and actual

3   damages Craigslist seeks in this action exceed the total amount of revenue earned by Defendants

4   through the sale of the offending software.  *Id.* at 11:8-10.  Defendants maintain that, contrary to

5   Craigslist's assertions, they did cease operations of the businesses in question at the onset of this

6   litigation.  *Id.* at 11:10-11.  Finally, Defendants claim that the statutory and actual damages in this

7   action are sufficient to deter them or others running similar businesses in the future and furthermore

8   that there is no need to deter Defendants since they abandoned their business over a year and a half

9   ago.  *Id.* at 11:11-15.

10    Punitive damages are available under the Lanham Act pursuant to California Civil Code

11   section 3294(a).  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1024 (9th Cir.

12   1985).  California Civil Code section 3294(a) provides that:

13    In an action for the breach of an obligation not arising from contract, where it is proven by
    clear and convincing evidence that the defendant has been guilty of oppression, fraud, or
14    malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of
    example and by way of punishing the defendant.
15

16   Malice is defined as "despicable conduct which is carried on by the defendant with a willful and

17   conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1).

18    It is uncontested that Defendants knowingly developed and marketed software with the sole

19   purpose of circumventing the security measures put in place by Craigslist and did so with the

20   knowledge that they were acting in violation of Craigslist's TOU.  Furthermore, as previously

21   discussed, the undersigned has determined that Defendants have acted fraudulently in their efforts to

22   evade Craigslist's recovery in this matter.[8]  However, although Defendants have acted

23   reprehensibly, the undersigned finds that the ratio between the recommended compensatory damages

24   award in this action and the actual damages suffered, nearly 52:1, makes a separate punitive

25   damages award unnecessary.  The undersigned finds that the compensatory damages award of

26   _____

27    [8]For a full discussion of Defendants' intent to create Mesiab Labs as a means to escape
28   liability in this action see Sec. III(A)(2)(a)(ii) and Sec. III(A)(2)(b)(ii).

21

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   $6,187,444.48 is sufficient to address Defendants behavior and deter both Defendants and others

2   from committing similar acts in the future.

3        Therefore, the undersigned recommends that the Court DENY Craigslist's request for

4   punitive damages.

5   **C.    Attorney's Fees and Costs**

6        Craigslist also requests that the Court award attorneys' fees and costs.  Craigslist seeks

7   $398,993 in fees and $11,281.91 in costs.  (McDougall Decl. ¶¶ 5, 6, Dkt. #67.)  Craigslist claims

8   that it is entitled to fees and costs as it had no option but to pursue the instant action given

9   Defendants' "brazen attitude and continued efforts to continue to profit from their unauthorized and

10  illegal activity at craigslist's expense."  (Pl.'s Mot. 26:1-3, Dkt. #61.)

11       Defendants argue that the number of hours expended by Craigslist in this action was

12  "excessive and duplicative."  (Defs.' Opp'n 11:20-22, Dkt. #72.)  Accordingly, Defendants request

13  that the Court take into consideration that this matter was uncontested and furthermore that

14  Craigslist had previously filed "nearly identical" actions against other defendants.  *Id.* at 11:20-12:1.

15       The DMCA authorizes a court, "in its discretion," to award costs and reasonable attorneys

16  fees to the prevailing party.  17 U.S.C. § 1203(b)(4), (5); *Sony Computer Entm't Am., Inc.*,  457 F.

17  Supp. 2d at 967.  Additionally, the Lanham Act provides that "[t]he court in exceptional cases may

18  award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  The Ninth Circuit has

19  recognized that, "[w]hile the term 'exceptional' is not defined in the statute, attorneys' fees are

20  available in infringement cases where the acts of infringement can be characterized as malicious,

21  fraudulent, deliberate, or willful."  *Rio Properties, Inc. v. Rio Int'l. Interlink*, 284 F.3d 1007, 1023

22  (9th Cir. 2002) (citing *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir.

23  1982)).

24       In support of its request for an award of fees, Craigslist contends that it had no option but to

25  pursue this action in order to stop Defendants' unauthorized and unlawful activities.  (Pl.'s Mot.

26  26:1-3, Dkt. #61.)   The undersigned has previously determined, in calculating Craigslist's damages

27  in this action, that Defendants have demonstrated the willful, deliberate, and fraudulent conduct

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   necessary to establish that this is an "exceptional" case for purposes of 15 U.S.C. § 1117(a).  The

2   undersigned therefore recommends that the Court award attorneys' fees and costs as detailed below.

3        To determine a reasonable attorney fee award, courts employ the lodestar method.

4   *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1214-15 (9th Cir. 2003).  Under the

5   lodestar method, a court must multiply the number of hours reasonably expended on the litigation by

6   the reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Once calculated, the

7   lodestar rate may be adjusted to account for other factors, including the customary fee, nature and

8   length of the professional relationship between client and attorney, and the awards allowed in similar

9   cases.  *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.9 (9th Cir. 1996).

10       1.    Hourly Rates

11       In determining a reasonable attorneys' fee award, the undersigned must find an objective

12   source for setting counsel's hourly rates and determine whether the hours expended by counsel are

13   concordant with the requirements of the litigation at hand.  Craigslist submitted a detailed

14   itemization of its attorneys' fees and costs, as summarized in the Declaration of Elizabeth

15   McDougall.  (McDougall Decl., Dkt. #67.)  McDougall attests that two partners, two associates, and

16   two paralegals from the firm of Perkins Coie LLP ("Perkins") were the principals working on this

17   matter.  *Id.* at ¶¶ 8-13.

18       Elizabeth McDougall has been a practicing attorney since 1993 and is a seventh year partner

19   at Perkins.  She is the lead attorney in this matter.  Her practice has focused on commercial litigation

20   with a substantial portion devoted to intellectual property and internet related issues.  Her billing rate

21   was $525 per hour in 2008, $550 per hour in 2009 and $565 per hour in 2010.  (McDougall Decl.

22   ¶32, Dkt. #63.)

23       James McCullagh has been a practicing attorney since 1999 and is a fourth year partner at

24   Perkins.  His area of practice is commercial litigation with a substantial portion of his practice

25   devoted to intellectual property and internet related issues.  His billing rate was $485 per hour in

26   2008, $500 per hour in 2009 and $535 per hour in 2010.  *Id.* at ¶ 33.

27       Brian Hennessy has been an attorney since 2003 and is a fifth year associate at Perkins.  Mr.

28

23

1   Hennessy's area of practice is commercial litigation with a substantial portion of his practice

2   devoted to intellectual property issues.  His billing rate was $395 per hour in 2008, $425 per hour in

3   2009 and $515 per hour in 2010.  *Id.* at ¶ 34.

4        Liling Poh is a second year associate at Perkins.  Her area of practice is commercial litigation

5   with a substantial portion of her practice devoted to intellectual property issues.  Her billing rate was

6   $320 per hour 2009 and $355 per hour 2010.  *Id.* at ¶ 35.

7        David Weeks has been a paralegal since 2000.  His billing rate was $230 per hour in 2008,

8   $240 per hour in 2009, and $245 per hour in 2010.  *Id.* at ¶ 36.

9        Matthew Sargent has been a paralegal since 2006.  His billing rate was $180 per hour in 2009

10  and $185 per hour in 2010.  *Id.* at ¶ 37.

11       Plaintiff seeks $398,993.00 in attorneys' fees.  A summary of this amount is as follows:

| Name | Hours | | Rate | | Amount |
|---|---|---|---|---|---|
| Elizabeth McDougall: | 57.9 hours | x | $550.00 | = | $31,845.00 |
| | 135.6 hours | x | $565.00 | = | $76,614.00 |
| | | | TOTAL = | | **$108,459.00** |
| James McCullagh: | 19.1 hours | x | $485.00 | = | $9,263.50 |
| | 21.3 hours | x | $500.00 | = | $10,650.00 |
| | 16.0 hours | x | $535.00 | = | $8,560.00 |
| | | | TOTAL = | | **$28,473.50** |
| Brian Hennessy: | 26.4 hours | x | $395.00 | = | $10,428.00 |
| | 79.0 hours | x | $425.00 | = | $33,575.00 |
| | 179.8 hours | x | $515.00 | = | $92,597.00 |
| | | | TOTAL = | | **$136,600.00** |
| Liling Poh: | 6.2 hours | x | $320.00 | = | $1,984.00 |
| | 80.2 hours | x | $355.00 | = | $28,471.00 |
| | | | TOTAL = | | **$30,455.00** |
| David Weeks: | 37.6 hours | x | $230.00 | = | $8,648.00 |
| | 40.0 hours | x | $240.00 | = | $9,600.00 |
| | 161.6 hours | x | $245.00 | = | $39,592.00 |
| | | | TOTAL = | | **$57,840.00** |
| Matthew Sargent: | 0.2 hours | x | $180.00 | = | $36.00 |
| | 200.7 hours | x | $185.00 | = | $37,129.50 |
| | | | TOTAL = | | **$37,165.50** |
| | | | **TOTAL FEES:** | | **$398,993.00** |

A widely recognized compilation of attorney and paralegal rate data is the Laffey matrix, so

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

24

named because of the case that generated the index.  In *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir.1984), the court employed a variety of hourly billing rates to account for the various attorneys' different levels of experience. The Laffey matrix has been regularly prepared and updated by the Civil Division of the United States Attorney's Office for the District of Columbia and used in fee shifting cases, among others.  *See* http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html, last visited November 10, 2010.  The Laffey matrix is especially useful when the work to be evaluated was performed by a mix of senior, junior and mid-level attorneys, as well as paralegals, as is the case in this action.

Under the 2009-2010 Laffey matrix[9], attorneys bill at the following rates according to experience:

| Experience | Rate Per Hour |
|---|---|
| 20+ Years | $464 |
| 11-19 Years | $410 |
| 8-10 Years | $330 |
| 4-7 Years | $270 |
| 1-3 Years | $225 |
| Paralegals | $130 |

These figures are, however, tailored for the District of Columbia, which has a different cost of living than San Francisco.  Accordingly, some adjustment appears appropriate here.  To make the adjustment, the undersigned will use the federal locality pay differentials based on federally compiled cost of living data.  *See* U.S. Office of Personnel Mgmt., 2009 General Schedule of

_____

[9]According to the United States Attorney's Office website, available at http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html, there was no change in the *Laffey* rates between 2008-2009 and 2009-2010.  Furthermore, since the McDougall Declaration was filed on May 27, 2010 and the *Laffey* rates for 2009-2010 are applicable through May 31, 2010 it is unnecessary to include the 2010-2011 rates.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

Locality Pay, available at http://www.opm.gov/oca/09tables/indexGS.asp (last visited 11/10/2010); *In re HPL,* 366 F. Supp. 2d 912, 921 (N.D. Cal. 2005) (Walker, J) (adjusting locality pay differentials based on the geographical region in which lead counsel's firm operated). A review of the pay tables shows the Washington-Baltimore area has a +23.10 percent locality pay differential, while the San Francisco area ("SF") has a +34.35 percent locality pay differential. Adjusting the Laffey matrix figures accordingly will yield appropriate rate for San Francisco: +11.25.

Applying these adjustments, the undersigned obtains the following rates (rounded to the nearest dollar):

| *Experience* | *Rate Per Hour* |
|---|---|
| 20+ Years | $516 |
| 11-19 Years | $456 |
| 8-10 Years | $367 |
| 4-7 Years | $300 |
| 1-3 Years | $250 |
| Paralegals | $145 |

Based on these rates, it is apparent that the rates charged by Perkins, as listed above, are somewhat higher than the rates under the Laffey matrix. In her declaration, Elizabeth McDougall states that the hourly fees charged to Craigslist are discounted and therefore less than those that would routinely be charged by similarly situated attorneys. (Dkt. #67, ¶¶ 8-13.) Aside from this statement from its counsel, however, Plaintiff presents no evidence that the attorneys' fees requested here are a conservative estimate of the fees that it is entitled to receive. Thus, the undersigned is inclined to accept the hourly rates under the Laffey matrix. The following table reflects the Court's adjusted lodestar calculations for attorneys and paralegals working on the case.

///

///

///

///

| Attorney/Paralegal | Years Experience | 2009-2010 Laffey Rate | Total Hours | Total Lodestar (Based on Laffey Rate) |
|---|---|---|---|---|
| Elizabeth McDougall | 17 | $456 | 193.5 | $88,236.00 |
| James McCullagh | 10 | $367 | 56.4 | $20,698.80 |
| Brian Hennessy | 7 | $300 | 285.2 | $85,560.00 |
| Liling Poh | 2 | $250 | 86.4 | $21,600.00 |
| David Weeks | Paralegal | $145 | 239.2 | $34,684.00 |
| Matthew Sargent | Paralegal | $145 | 200.9 | $29,130.50 |

Based on the above calculations, the total reward under the Laffey matrix is $279,909.30. However, the undersigned must also consider whether the number of hours is reasonable.

> b.      Number of hours

The Court next evaluates whether the number of hours expended by Perkins is appropriate to the requirements of the particular case.  Reasonably competent counsel bill a reasonable number of hours; they do not bill hours that are "excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.  Thus, if the requested number of hours is greater than the number of hours reasonably competent counsel would have billed, then the Court should reduce the requested number of hours accordingly.  *Id.*  Additionally, the Court must take into consideration discounts commonly given to clients.  As emphasized by the Supreme Court in *Hensley*, "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."  *Id.*

Defendants claim that the hours Craigslist expended pursuing this action were "excessive and duplicative" in light of the fact that Craigslist has filed "nearly identical actions" against several other Defendants.  Craigslist offers the following declaration from Elizabeth McDougall in support of the amount of its fees request:

> This case focused on the ever-changing technologies and security measures employed on the internet, and developing successful strategies for approaching these novel concepts requires unusual effort and skill.  Though the novel issues in this case required substantial research and examination, we did not include any of the fees incurred

27

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

for drafting the initial complaint or fees for work that was not easily
separated as applying solely to this case.  Therefore, the attorneys'
fees and expenses requested here are a conservative estimate of the
fees that [C]raigslist is entitled to receive.

(McDougall Decl., ¶ 41, Dkt. #63.)

4

5

6

7

8

9

10

        Upon review of Craigslist's submissions, the Court finds that the number of hours expended
by counsel is appropriate to the requirements of this case.  The bulk of the billable hours presented
in Craigslist's accounting of fees is from its efforts to complete third-party discovery.  As this
discovery is unique to the instant action, the undersigned does not find that those hours are either
duplicative or excessive considering the circumstances.   Accordingly, the undersigned recommends
the District Court award Craigslist its attorneys' fees in the amount of $279,909.30.

        c.      Costs

11

12

13

14

15

16

17

18

        Finally, Craigslist seeks costs in the amount of $11,281.91.  These costs include messenger
and service costs of $1,767.31, pro hac vice costs of $210.00, a filing fee of $350.00, document
production and witness fees of $666.60 and court reporter costs totaling $8,288.00.  (McDougall
Decl., ¶ 6, Ex. H, Dkt. #67-8.)  Craigslist has provided itemized billing statements which include all
of the aforementioned costs.  *Id.*   The Court finds the costs requested by Craigslist reasonable and
accordingly, the undersigned recommends the District Court award Craigslist its costs in the amount
of $11,281.91.

19

///

///

20

///

21

///

22

///

23

///

24

///

25

///

26

///

27

///

28

28

**III. CONCLUSION**

Based on the foregoing, the undersigned RECOMMENDS that the District Court:

(1)  GRANT Craigslist's request to amend judgment to add Mesiab Labs as a judgment debtor in this action;

(2)  award Craigslist $6,067,700.00 in statutory damages under the DMCA and $119,744.48 in actual damages pursuant to the Lanham Act, for a total of $6,187,444.48;

(3) DENY Craigslist's request for punitive damages; and

(4) GRANT Craigslist's request for attorneys' fees in the amount of $279,909.30 and costs in the amount of $11,281.91.

**IT IS SO RECOMMENDED.**

Dated: November 15, 2010

_____
Maria-Elena James
Chief United States Magistrate Judge